The Shaw-Walker Company v. Commissioner.
Shaw-Walker Co. v. Commissioner
Docket No. 91330.
United States Tax Court
T.C. Memo 1965-309; 1965 Tax Ct. Memo LEXIS 22; 24 T.C.M. (CCH) 1709; T.C.M. (RIA) 65309; November 30, 1965
*22 Held, Petitioner accumulated earnings and profits beyond the reasonable needs of its business, and petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders during the years in issue. John P. Carroll, Jr., and Cyrus J. Halpern, for the petitioner. Claude R. Wilson, Jr., for the respondent. FORRESTER
*23 Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined deficiencies in tax against the petitioner as follows: Fiscal Year Ended
Accumulated Earnings Tax
June 30th
(Sec. 531, I.R.C. 1954)
1955
$ 308,938.49
1956
642,236.07
1957
629,191.94
Total
$1,580,366.50
The only issue is whether petitioner was availed of during the taxable years for the purpose of avoiding the income tax *24 with respect to its shareholders by permitting earnings and profits to accumulate beyond the reasonable needs of the business instead of being divided or distributed. Findings of Fact The stipulated facts are found as stipulated. The Shaw-Walker Company is a corporation organized under the laws of Michigan with its principal factories and home office at Muskegon, Michigan. Its income tax returns for the taxable years were filed with the district director of internal revenue, Detroit, Michigan. It keeps its books and records and reports its income on a fiscal year basis ending June 30th. It uses the accrual method of accounting. The Nature and Development of Petitioner's Business A. W. Shaw and L. C. Walker organized the petitioner in 1899 with less than $3,500 capital. In 1902 Shaw began to devote his principal attention to "System," a magazine founded by himself and L. C. Walker. In or about 1903 Shaw moved to Chicago where he directed petitioner's recently established Chicago branch and the publication of "System." Shortly thereafter Shaw withdrew from active participation in petitioner's business as an executive but continued to be a director thereof through the years *25 in issue. Since Shaw's withdrawal, and continuing through the taxable years, the management of the petitioner was under the direction of L. C. Walker. The petitioner has always been engaged in the office equipment business. Initially, it sold a card index and a set of guides mainly as a mail order business. Gradually, over a period of time, petitioner began to manufacture containers to house these supplies, and eventually to manufacture wooden filing cabinets and desks. In or about 1917 the petitioner began to manufacture steel filing cabinets and later, in or about 1928, steel desks. Gradually its product lines grew and expanded into adjacent areas. For some time prior to 1955, petitioner advertised that it made and sold "Everything for the Office Except Machines." By June 30, 1957, petitioner was manufacturing some 5,000 different products which required for their illustration and description a printed catalog entitled "Office Guide" which consisted of over 240 pages. During the taxable years petitioner's products were metal office furniture, including desks, tables, bookcases, chairs of aluminum, steel, and combinations of metal and wood; filing cabinets, protective equipment *26 for records; machine bookkeeping equipment, including trays and record housings for ledger cards; bank operating equipment; and filing supplies, including filing folders and index cards. The petitioner started its business in a rented space 36 X 70 feet. In 1900 it constructed its first plant and office building, a one-story frame structure. It gradually expanded its manufacturing facilities at Muskegon and its branch offices over the country. By June 30, 1957, its facilities had been expanded into a manufacturing head-quarters at Muskegon consisting of a series of plants and an office building and into 18 branch sales offices in major cities of the United States, all but one with its own warehouse. The office equipment industry includes manufacturers and sellers of office machinery, furniture, filing supplies, and various other items of office supply and equipment. The manufacture of office machinery is a separate and distinct branch of the office equipment industry. During the taxable years in question, petitioner was engaged principally in the furniture, filing supplies, and filing equipment segment of the office equipment industry, which had been its business since shortly after *27 its organization. The petitioner operated in a competitive market during the taxable years. Included among its major competitors were: Remington Rand Corporation, Art Metal, Inc., General Fireproofing Co., Steelcase, Inc., All Steel Equipment Co., Yawman & Erbe Manufacturing Co., Inc., and the Globe-Wernicke Co. There are approximately 10,000 office equipment dealers in the United States, and 65 percent of them have an annual sales volume of less than $500,000. Since World War II, office equipment dealers have not generally been exclusive dealers and they carry merchandise of competing lines. A manufacturer's price to a dealer is usually the same whether he is a franchised dealer, or an "exclusive" dealer, or a dealer carrying more than one line of office equipment. The 1953 United States Census of Manufacturers indicates that the following number of companies were engaged in specified industries in 1954 and 1958: Wood Office Furniture-111 in 1954 and 147 in 1958; Metal Office Furniture-122 in 1954 and 142 in 1958. During the period 1950 to 1957 there was a price rise in the office equipment industry. Since World War II, the cost of labor and raw materials have been rising *28 constantly. In 1960 a New York Federal grand jury started investigations into anti-trust violations in the metal office furniture industry which eventually resulted in certain indictments. During the taxable years the petitioner's sales organization consisted of three divisions: (1) its system of branch sales offices; (2) its dealer sales organization; and (3) its Kopi-Spot division, which operated from petitioner's branch sales offices but was organized as a separate division. Petitioner's branch offices sold its products in competition with the branch offices of other office equipment manufacturers as well as local dealers who sold the products of many manufacturers. Through its branch offices petitioner maintained a greater degree of direct contact with its customers than it otherwise could. Thus, its branches provided it with a constant source of information concerning the needs of users of office equipment and helped to keep it well informed of its customers' needs and assisted it to develop its product lines to meet these needs. During the taxable years the sales of Kopi-Spot accounting systems (hereinafter described) produced about 10 percent of petitioner's gross sales. *29 Approximately 90 percent of all Kopi-Spot products sold during these years were sold through petitioner's branch offices rather than through dealers. Branch office sales of other product lines during the same period were substantially smaller than sales through dealers. Since the end of World War II the sale of Kopi-Spot accounting systems has been the most rapidly growing aspect of petitioner's business. Merchandise shipped by petitioner to a branch office was charged to the branch and removed from the Muskegon inventory account. The transfer was reflected at petitioner's cost for the inventory item at the time of the transfer. An inventory for each branch was maintained in a separate account on petitioner's books and records. The Management of Petitioner's Business In 1908 L. C. Walker became president of the petitioner. From that time through the taxable years herein the petitioner operated under his direction and control. During the taxable years petitioner's management consisted of seven men whose position in and service with the petitioner were as follows: Continuously
Position Occupied
With Peti-
Office
Name
June 30, 1957
tioner Since
Location
L. C. Walker
President
1899
Muskegon
Shaw Walker
Exec. Vice President
1937 *
Muskegon
Guy M. Harrington
Sec., Treas., Vice President
1929
Muskegon
R. C. Boyd
Asst. Vice Pres.,
Mangr. Dealer Sales
1921
Muskegon
A. B. Nevins
Asst. Vice Pres.,
Director of Factories
1904
Muskegon
A. R. Hedeman
Asst. Vice Pres.,
Mangr. Branches
1928
New York
L. K. Straus
Asst. Vice Pres., Mangr. Payroll
Accounting Kopi-Spot Division
1915
New York
*30 In the taxable year 1955 Harrington was treasurer of petitioner; in the taxable year 1956 he was both secretary and treasurer; and in the taxable year 1957 he held the three positions listed above. The board of directors consisted of six members all of whom were officers or executives except A. W. Shaw. The members of the petitioner's board of directors in the taxable year 1955 were: L. C. Walker; Shaw Walker, son of L. C. Walker; A. B. Nevins; Guy Harrington; J. J. Bourgoine, who was a vice president; and A. W. Shaw. The only change in the board of directors during the taxable years 1956 and 1957 was that R. C. Boyd replaced J. J. Bourgoine. At the end of World War II L. C. Walker was about 70 years of age. In 1956 L. C. Walker had his first stroke, and his attendance at petitioner's office gradually decreased until 1959, after which he no longer came to the office. From 1960 he was confined to his home in a wheel chair, a conventional chair, or a bed. By September 1960, he was physically unable to work or speak continuously on business subjects for more than an hour or two at a time and not every day. After *31 completing his military service in World War II, Shaw Walker resumed his employment with petitioner. He took charge of coordinating dealer activities. This was one of two sales management jobs with the petitioner, the other being the management of branch offices which was handled from New York. From time to time thereafter Shaw Walker was given additional management duties and responsibilities by L. C. Walker. One such responsibility was the determination of executive bonuses including those for the branch managers. Shaw Walker was brought into the annual discussions held by L. C. Walker regarding these bonuses for a period of 5 or 6 years before he took charge of them in or about 1954. Shaw Walker's duties and responsibilities in managing petitioner's affairs increased with his father's advancing age and physical infirmities. Although he became president of the petitioner on November 21, 1957, he still reported to L. C. Walker as chairman of the board and its chief executive officer. When L. C. Walker was no longer able to come to the office, the other executives went to him, and they consulted him frequently about business matters. L. C. Walker was consulted about management problems *32 until shortly before his death in 1963. By the middle of 1954 Shaw Walker was involved in petitioner's attempt to develop a new machine known as the "Timer." Its development had been authorized by L. C. Walker who supervised the project until late in the fiscal year 1961. Shaw Walker became more and more involved with the development of this machine subsequent to the taxable years. Petitioner has followed a policy of filling its principal management positions by promoting employees with substantial periods of service. All of its 1955 executives, except Shaw Walker, had 25 years or more of continuous service with the petitioner. Prior to and during the taxable years the executives located in Muskegon constituted a majority of the board of directors. These executives operated the petitioner by the method of daily consultation since they saw each other almost daily and sometimes many times a day. When matters came up that had to be solved they were able to discuss their problems with L. C. Walker and have a decision made. Thereafter, the decisions and actions of the executives were simply ratified or approved by the board of directors. The working capital requirements of petitioner *33 during the taxable years were determined by L. C. Walker, Guy Harrington, and Shaw Walker. At various times during the year Harrington carefully calculated the capital requirements of the business. He discussed his estimates in detail with L. C. Walker and/or Shaw Walker. L. C. Walker and Shaw Walker also made forecasts or estimates of petitioner's capital requirements. These estimates were discussed and analyzed by the three men and a conclusion reached as to the working capital needed for the forthcoming period. The petitioner's business has never been run on formulas, statistics, graphs, and so forth, and reports on its operations were kept at a minimum. Management received no financial reports on a daily basis. The only reports received on a semi-weekly basis were cash reports. No reports were received on a weekly basis. Sales reports, a balance sheet, and a profit and loss statement were the principal reports received on a monthly basis. Balance sheets and income statements were received on an annual basis. Petitioner's Capitalization and Principal Shareholders The petitioner has been financed through debt, the issuance of preferred stock, the issuance of common stock, *34 and retained earnings. When it was organized, 200 shares of common stock with a par value of $10 per share were issued for cash and service. There has been no additional cash investment in its common stock, except through the purchases of Executive Stock as hereinafter described. In 1903 the petitioner authorized its first issue of preferred stock in order to acquire the assets of The Muskegon Cabinet Company. From time to time thereafter preferred stock was issued. The last issue of preferred stock for cash or property was in the taxable year ended June 30, 1931, a year in which preferred stock outstanding was at its maximum, viz., $1,145,100. The last issuance of preferred stock occurred as a part of a recapitalization in 1936. The petitioner's preferred stock has at all times been subject to provisions requiring its retirement out of a sinking fund. The preferred stock (5 percent cumulative) was called for retirement at $100 per share on July 5, 1955. The petitioner had been advised by its counsel that the preferred was a matured stock after July 5, 1950, and that any stockholder was entitled to demand payment for his stock. Among the considerations that prompted petitioner's *35 management to call its preferred stock for redemption were: (1) it no longer needed outside money in its business; (2) it was expensive having outside money since dividends had to be paid thereon; and (3) after maturity in 1950, the stock represented a constant liability hanging over the business. Pursuant to the call for retirement, $363,200 was placed on deposit at the Hackley Union National Bank in Muskegon to be held in trust for the former certificateholders of preferred stock. Thereafter, such funds were not included in the cash account of the petitioner on its books and records. As the preferred stock certificates were presented for redemption, the bank redeemed them. Upon notification that preferred stock had been redeemed, petitioner reduced the amount of issued and outstanding preferred stock accordingly, as reflected by a memorandum account on its general ledger. The audit reports for the taxable years show that 3,632 shares of preferred were issued and outstanding at July 1, 1955, 178 shares at June 30, 1956, and 175 shares at June 30, 1957. Respondent agrees that the retirement of petitioner's preferred stock was not employed as a device by which to distribute earnings *36 in such a way as to avoid the income tax with respect to petitioner's shareholders. At the close of each of the taxable years herein petitioner had the following number of shares of regular common stock and Executives Stock outstanding: June 30,
June 30,
June 30,
1955
1956
1957
Regular common
stock
108,197
108,197
108,197
Executives Stock *
14,026
13,548
14,098
At all times material hereto the petitioner has been controlled by the Walker family including L. C. Walker, his wife and their children and grandchildren, including various trusts and estates in which they had an interest. The Walker family owned approximately 65 to 70 percent of the common stock of the petitioner. At the end of the calendar years 1954 to 1958, inclusive, L. C. Walker, his wife, Margaret, her estate, and Shaw Walker owned the following number of shares of petitioner's common stock: Estate of
Margaret
Margaret
Shaw
Year
L. C. Walker
Walker
Walker
Walker
1954
20,474 1/6
15,350
29,008
1955
20,474 1/6
15,350
29,008
1956 *
35,474 1/6
350
29,008
1957
35,474 1/6
350
29,008
1958
35,474 1/6
350
29,008
*37 During the taxable years A. W. Shaw held approximately 13,000 shares of stock in the petitioner. The last time the petitioner owed money to a banking institution was about 1938. It was against the policy of the company to borrow. It followed the practice of financing its undertakings out of the earnings of the business. Petitioner's Loans to and Compensation of the Shareholders, and its Investments During the taxable years the petitioner had notes receivable from only two of its shareholders who were minor executives. The notes were in the original principal amount of $3,000 but had been reduced to $900 by June 30, 1957. These two shareholders owned, between them, less than one quarter of one percent of petitioner's stock outstanding during the taxable years. The petitioner did not lend money to its shareholders for the purpose of withdrawing earnings in such a way as to reduce, avoid, or minimize income taxes on its income or the distribution of such income. During the taxable years the petitioner paid no salary or other *38 compensation to any person who owned more than three percent of its total outstanding common stock of all classes except the compensation paid to L. C. Walker and Shaw Walker. The total compensation paid to these two men by petitioner during the taxable years, and the total dividends distributed by petitioner and taxable to them individually for Federal income tax purposes were as follows: Calendar
L. C. Walker
Shaw Walker
Year
Dividends
Compensation
Dividends
Compensation
1954
$179,171
$25,000
$145,100
$15,000
1955
179,721
35,417
145,070
17,083
1956
213,195
50,000
174,048
20,000
1957
213,845
50,000
174,048
21,667
The petitioner has never expended funds for the maintenance of personal living quarters, vacation facilities, resort properties, private automobiles or airplanes, or private travel for its shareholder employees. During the taxable years petitioner owned about 75 percent of the stock of Mastercraft Corporation, which manufactured accounts payable and accounts receivable forms for the petitioner. The Mastercraft Corporation has dealers all over the United States selling their products and has a very satisfactory *39 business of its own. The petitioner's interest in Mastercraft stock has continued and it buys such stock whenever it is available. During the fiscal years 1946 through 1963 petitioner invested $5,010 in the stock of Glenside Gardens, a housing project encouraged by the industries of Muskegon to provide housing for personnel brought into war industries. No dividends were received on this stock and petitioner did not trade in it. For a brief period petitioner owned 5 or 10 shares of stock in Globe Wernicke, a competitor. This stock was offered to petitioner which bought it to obtain information on its competitor. Except for the above, petitioner owned no other corporate stocks. Funds Used in Petitioner's Business Operations, and Their Source During the fiscal years ended June 30, 1947 through 1962, the petitioner's annual sales, total income, cost of goods sold, contributions, and various disbursements, which are listed herein as operating expenses, were as follows (cents omitted): Income *
Year Ended
(Per Tax
Cost of Goods
Contribu-
Operating
June 30
Net Sales
Returns)
Sold
tions
Expenses **
1947
$ 9,717,687
$ 4,728,650
$ 5,180,747
$ 21,135
$2,445,190
1948
11,589,572
5,515,323
6,163,984
43,609
2,967,821
1949
12,690,777
5,846,143
6,957,180
43,197
3,437,793
1950
13,500,163
6,212,620
7,420,816
120,095
3,688,125
1951
19,200,046
9,402,677
10,005,140
162,375
4,649,740
1952
20,391,436
9,640,193
11,005,656
228,380
4,913,671
1953
20,093,086
9,303,244
10,979,240
187,904
5,329,248
1954
18,449,155
8,595,751
10,056,959
118,293
5,507,721
1955
18,912,502
9,023,587
10,113,761
24,915
5,895,567
1956
24,466,427
11,949,964
12,829,415
116,393
6,571,843
1957
24,408,878
12,485,953
12,198,022
115,589
7,049,042
1958
21,807,503
11,254,163
10,998,847
162,570
6,930,545
1959
22,556,642
11,163,348
11,678,958
141,221
7,061,492
1960
25,640,670
12,927,892
13,046,435
115,424
8,358,268
1961
23,417,007
11,913,318
11,826,768
23,364
8,486,951
1962
24,797,897
12,542,379
12,543,084
72,830
8,924,183
*40 For the same fiscal years petitioner claimed depreciation deductions and reported its income tax liability on its income tax returns as follows (cents omitted): Year Ended
Depreciation
Tax Liability
June 30
Deducted
Reported
1947
$ 50,740
$ 813,297
1948
65,019
913,416
1949
75,349
849,469
1950
83,797
861,148
1951
100,892
2,767,939
1952
117,635
2,894,532
1953
117,535
2,283,259
1954
121,329
1,519,460
1955
125,230
1,517,218
1956
$142,430
$2,629,057
1957
141,791
2,660,188
1958
142,340
2,060,037
1959
138,627
1,957,483
1960
153,930
2,207,519
1961
196,302
1,633,832
1962
302,420
1,652,712
The petitioner's current assets, current liabilities, working capital, and ratio of current assets to current liabilities for the fiscal years 1947 through *41 1962 were as follows (cents omitted): Year Ended
Current
Current Lia-
Working
Ratio Assets to
June 30
Assets *
bilities **
Capital
Liabilities
1947
$ 4,745,617
$1,233,532
$ 3,512,085
3.85
1948
5,813,520
1,393,388
4,420,131
4.17
1949
6,618,123
1,455,564
5,162,558
4.55
1950
7,119,324
1,348,880
5,770,443
5.28
1951
10,222,709
3,783,619
6,439,089
2.70
1952
11,052,675
3,840,098
7,212,576
2.88
1953
11,416,027
3,473,926
7,942,101
3.29
1954
11,109,688
2,571,455
8,538,242
4.32
1955
11,420,413
2,406,041
9,014,372
4.75
1956
14,011,457
3,604,229
10,407,227
3.89
1957
15,439,166
3,284,696
12,154,469
4.70
1958
16,584,312
3,095,828
13,488,484
5.36
1959
16,523,502
2,290,371
14,233,131
7.21
1960
17,449,925
2,681,114
14,768,811
6.51
1961
17,363,410
1,582,486
15,780,924
10.97
1962
17,937,965
1,862,067
16,075,898
9.63
The petitioner's inventories and the ratio of its quick assets (current assets less inventories) to its current liabilities for the fiscal years 1947 through 1962 were as follows (cents omitted). *42 Ratio Quick Assets
Year Ended
to Current Lia-
June 30
Inventories
bilities
1947
$1,580,510
2.57
1948
2,003,267
2.73
1949
2,259,759
2.99
1950
2,071,891
3.74
1951
2,948,654
1.92
1952
3,110,059
2.07
1953
2,709,165
2.51
1954
3,125,316
3.11
1955
$3,162,341
3.43
1956
3,831,523
2.82
1957
3,495,969
3.64
1958
3,369,068
4.27
1959
3,652,879
5.62
1960
4,036,247
5.00
1961
3,809,309
8.57
1962
3,947,335
7.51
During each of the fiscal years ended June 30, 1947 through 1962, petitioner's cash or cash equivalents were as follows (cents omitted): United States
Year
Savings
Treasury
Total Cash
Ended
Petty
Bonds
Notes and
Certificates
or Cash
June 30
Cash
Cash
Unissued
Bills
of Deposit
Equivalents
1947
0
$1,274,757
0
$ 832,000 $0
$ 2,106,757
1948
$18,796
1,120,174
$3,206
1,530,000
0
2,672,177
1949
23,744
1,433,211
6,393
1,830,000
0
3,293,350
1950
25,381
1,555,476
4,987
2,130,000
0
3,715,845
1951
24,894
1,579,935
2,925
2,830,000
0
4,437,755
1952
27,600
2,063,075
2,493
4,030,000
0
6,123,170
1953
30,423
3,059,101
2,662
3,900,000
0
6,992,187
1954
32,313
2,344,222
4,181
3,850,000
0
6,230,718
1955
37,248
2,852,126
5,662
3,247,541
0
6,142,578
1956
37,527
2,612,987
3,768
4,829,548
0
7,483,831
1957
47,908
2,883,326
9,450
6,471,145
0
9,411,830
1958 $0
$4,974,896 $0
$4,996,138
0
$ 9,971,034
1959
0
5,350,653
0
4,558,076
0
9,908,729
1960
0
5,170,223
0
5,214,315
0
10,384,538
1961
0
5,465,384
0
4,104,703
$1,000,000
10,570,087
1962
0
5,852,750
0
3,992,735
1,076,039
10,921,524
*43 During each of the fiscal years ended June 30, 1947 through 1962 petitioner's total assets and the percentage thereof that consisted of cash or cash equivalents were as follows (cents omitted): Year
Percentage
Ended
Total
Cash or
June 30
Assets
Cash Equivalent
1947
$ 5,818,153
36%
1948
7,021,779
38%
1949
8,080,227
40%
1950
8,964,390
41%
1951
12,054,659
36%
1952
13,002,218
47%
1953
13,366,077
52%
1954
13,014,288
47%
1955
13,987,171
43%
1956
$16,146,183
46%
1957
17,571,715
53%
1958
17,986,054
55%
1959
18,662,627
53%
1960
20,271,244
50%
1961
20,480,291
50%
1962
21,635,716
50%
The petitioner's accumulated earned surplus, excluding surplus reserves, as reflected by its tax returns, its capital stock, and its net worth for the fiscal years ended June 30, 1947 through 1962, were as follows (cents omitted): Accumulated
Capital Stock
Capital Stock
Year Ended
Earned
and Surplus
June 30
Surplus
Preferred
Common
(Net Worth)
1947
$ 2,636,254
$727,400
$1,220,966
$ 4,584,620
1948
3,720,456
701,200
1,206,733
5,628,390
1949
4,594,112
677,300
1,210,233
6,481,646
1950
5,401,576
601,700
1,212,233
7,215,509
1951
6,337,316
588,500
1,212,233
8,138,649
1952
6,759,063
575,400
1,220,233
8,554,696
1953
7,454,894
568,500
1,222,233
9,245,627
1954
8,120,986
375,500
1,223,233
9,719,719
1955
8,942,506
363,200
1,222,233
10,527,939
1956
10,285,253
17,800 *
1,217,459
11,520,512
1957
11,835,333
17,500 *
1,222,959
13,075,792
1958
12,938,579
14,500 *
1,223,959
14,177,038
1959
13,690,430
1,300 *
1,206,842
14,898,572
1960
14,797,413
1,300 *
1,201,592
16,000,305
1961
15,597,093
1,300 *
1,204,582
16,802,975
1962
16,153,342
1,300 *
1,207,082
17,361,724
*44 During the taxable years herein petitioner's net taxable income less provision for income taxes, dividends distributed, amount of earnings retained in the business, and the percentage of net income (after taxes) distributed as dividends were as follows: Net Taxable
Earnings
Percentage of Net
Income Less
Retained
Income (after taxes)
Year Ended
Provision
Dividends
in the
Distributed as
June 30
for Taxes
Distributed
Business
Dividends (%)
1955
$1,460,655.77
$629,646.70
$ 831,009.07
43.1
1956
2,490,240.09
792,604.57
1,697,635.52
31.8
1957
2,519,342.72
856,071.51
1,663,271.21
33.9
The petitioner did not compute or operate its business under any average rate of turnover of its inventory during or prior to the taxable years. Its inventory control was based upon the familiarity of its management with the thousands of items actually carried, and inventories were planned to permit production to flow in an orderly manner. *45 Because of the number and complexity of the items manufactured by petitioner, it was necessary to plan materials and inventories so as to have on hand at the beginning of a production run all the items required for such run. The petitioner planned its inventories on this basis rather than on the basis of rates of turnover. During the taxable years and for many years prior thereto, petitioner maintained records which showed the average collection period month by month of its accounts receivable on each dealer and branch office. It lumped its collection records into two groups, one for dealers and the other for branch offices. Management used these collection records in calculating the funds needed for future operations. It did not use or compute the turnover of its accounts receivable in conducting its business operations. The average monthly inventory and accounts receivable of petitioner for the fiscal years 1951 through 1961 were as follows (rounded to nearest thousand): Average
Year Ended
Average
Accounts
June 30
Inventory
Receivable
(000)
(000)
1951
$2,494
$1,993
1952
3,119
2,161
1953
2,691
1,953
1954
2,910
1,758
1955
3,103
1,869
1956
3,435
2,539
1957
3,710
2,729
1958
3,409
2,477
1959
3,437
2,585
1960
3,398
2,988
1961
4,006
2,719
*46 Petitioner's Expenditures for Fixed Assets On July 1, 1954, the total original cost of petitioner's fixed assets (exclusive of land) at its manufacturing headquarters at Muskegon was $2,843,305. These fixed assets included 17 major factory buildings with 554,500 square feet of floor space. As used herein a major factory building means a building with 2,000 or more square feet of floor space. Petitioner acquired 12 of these major buildings with 438,500 square feet of floor space during the fiscal years 1902 through 1929. At July 1, 1954, the average age of these 12 buildings was 38.5 years. During the fiscal years 1940 through 1954 petitioner constructed five more major factory buildings with 116,000 square feet of additional floor space. During the taxable years petitioner constructed only one major factory building, namely, building #31 in 1955, which added 33,000 square feet of floor space. In constructing building #31, which expanded manufacturing and storage facilities and was not a replacement, petitioner made the footings along one side larger than they normally would have been in order to support that portion of a building which might be built at a later date that would *47 have a common wall with building #31. Such a building, #33, was constructed in 1960. Subsequent to the taxable years, petitioner constructed the following major factory buildings: in 1960, buildings #18B and #33, the latter was a 60,000 square feet addition to petitioner's plant for storage and general utility purposes, erected at a cost of $425,675 exclusive of the cost of the machinery and equipment installed in it; in 1961, building #16B; and in 1962, building #21 with 35,000 square feet, which replaced and enlarged by 10,000 square feet a similarly numbered building known as the Haight building, that was acquired in 1928. These additions and replacements increased the available floor space in petitioner's major factory buildings at Muskegon to 667,500 square feet. Since 1906 petitioner has had Coats & Burchard Company, a Chicago firm, make annual appraisals of its plant, buildings, machinery and equipment. These appraisals reflected the opinion of the appraisers at the date of the report as to the value of and the cost to petitioner to replace such buildings, machinery and equipment with like items, but not with new and modern items. Petitioner used these appraisals as the *48 basis for its insurance program, for local taxation purposes, and as a source of general information about its properties. Prior to, during, and subsequent to the taxable years involved herein, petitioner made additions to and/or replacements of its fixed assets. The term "fixed assets," as used here, includes land, buildings, machinery and equipment, furniture and fixtures, tools and dies. For the fiscal years ended June 30, 1947 through 1963, petitioner's expenditures for fixed assets were as follows (in rounded thousands): Year Ended
Fixed Asset
June 30
Expenditures
(000)
1947
$ 168
1948
193
1949
158
1950
227
1951
500
1952
224
1953
$ 108
1954
63
1955
98
1956
326
1957
118
1958
103
1959
179
1960
723
1961
147
1962
670
1963
1,091 *
The petitioner followed the accounting practice of removing from its asset accounts any asset that was fully depreciated even though it was still used in business. This was not in accordance with standard accounting procedures. The following table shows additions to and deductions from fixed *49 assets at Muskegon for the taxable years: Year
Ended
Year End
Reserve for
June 30
Additions
Deductions
Balance *
Depreciation *
1954
$2,843,305
1955
$ 73,797
$ 52,916
2,864,185
$1,418,892
1956
320,422
130,226
3,054,379
1,418,714
1957
104,830
42,662
3,116,549
1,505,144
During and for the taxable years herein, the reserves for depreciation in petitioner's books of account which are reflected in its balance sheets and other financial statements, were established on a cost basis and were not funded reserves. The existence of these reserves does not indicate that cash or other property was set aside in amounts equal to the balances in the reserve accounts or in the amounts of the additions to such reserve accounts. The creation of the depreciation reserves and their annual enlargement by depreciation charges did nothing more than record in a systematic fashion the fact that portions of the amounts originally expended for *50 fixed assets at its manufacturing headquarters in Muskegon should be viewed as chargeable to the income of particular years of operation. The establishment of the depreciation reserves and the annual additions thereto did nothing toward creating or providing or setting aside funds with which to replace the assets to which the reserves were allocable. Reserve accounts were set up by petitioner on its books for contracts placed but not completed at the end of the year. The purpose of these reserves was to indicate the amount immediately required for these particular projects. One such reserve account was $250,000 set up at June 30, 1955, for the estimated cost of building #31, which was offset by a contra entry. Reserve accounts were also set up for the publication of petitioner's office guide catalog which accumulated part of the cost of the next publication. None of petitioner's reserves were funded. During the taxable years the petitioner used no composite useful life figure for its assets in making management decisions, nor did it make any exact study, estimate, or analysis to determine the cost of a replacement program for its plant or equipment. Petitioner's management was *51 aware of the age and condition of its plant and equipment and that its costs of operating, such as, fringe benefit, branch office, and labor, were increasing. Additions to and replacement of petitioner's fixed assets were made as and when management decided there was a need therefor. The additions and replacements were made pursuant to a general policy of expansion and improvement and were not made pursuant to any fixed, definite, and certain plans. Executives Stock The petitioner's Executives Stock is a class of common stock. It was first issued as "Industrial Stock" in 1916. Later, it was denominated "Executives Stock" under a resolution of petitioner's board of directors of July 23, 1928. The first 2,500 shares of Executives Stock sold for $10 a share. Thereafter and until 1944, the stock sold for prices varying between $10 and $20.50 a share. In and after 1944, the stock sold for $12 a share. During 1920, 1921, and 1929 stock dividends totaling 8,483-5/15 shares of Executives Stock were declared and distributed. During the period 1917 through 1944, petitioner repurchased 2,630 shares of Executives Stock for $34,759, which averaged about $13.21 per share. At June 30, 1944, the *52 issued and outstanding shares of petitioner's Executives Stock were 13,649-5/15 shares. During the 10 years preceding the first taxable year herein, petitioner sold 4,900 shares of Executives Stock for $58,800 and repurchased 4,423-5/15 shares for $107,069. During the taxable years, petitioner sold 575 shares for $6,900 and repurchased 602-6/15 shares for $45,347. During the six years 1958 to 1963, inclusive, petitioner sold 3,125 shares for $37,500 and repurchased 4,511-11/15 shares for $474,125. At June 30, 1963, the issued and outstanding shares of petitioner's Executives Stock were 12,711-13/15 shares. During the 46 years between 1917 and July 1, 1963, petitioner paid dividends on its issued and outstanding Executives Stock in all but 7 years, namely, 1918, and 1932 through 1937. The dividends paid thereon during this period aggregated $1,540,005, broken down as follows: 1917 through 1944, $314,094; 1945 through 1954, $493,369 (about $3.58 per share per year); the taxable years 1955, 1956, and 1957, $70,380 (about $5 per share), $89,322 (about $6.50 per share), and $98,690 (about $7 per share), respectively; and 1958 through 1963, $474,150 (about $6 per share per year). *53 During the 46 years between 1917 and July 1, 1963, petitioner realized $184,066 from the sale of Executives Stock. During the same period, petitioner disbursed $661,300 in the repurchase of Executives Stock. In May 1945 petitioner modified the terms and conditions under which Executives Stock had previously been issued. Acceptance of the modifications was solicited and received from all shareholders except one, who had inherited her stock. The stock certificates, as modified, provided that the shares were - transferable only on the books of the Corporation, in person, or by Attorney on surrender of this certificate, and subject to the conditions as hereinafter stated. This certificate of stock represents Executives No Par Value stock of the Company to be acquired by the executives and principal officers of this Company to be paid for on such terms as may be determined by the Board of Directors. In the declaration of dividends the stock shall be considered, up to the amount allotted, in all respects the same as No Par Value common stock. This stock is accepted by those to whom it is issued upon the following terms and conditions: 1. In the conditions herein set forth any offer *54 to the Company, or purchase of this stock by the Company, shall be for the benefit of the other stockholders of the Company for whom the Treasurer is empowered to act. 2. In determining the value of this stock for sale or purchase, except as hereinafter specified, it shall be the amount paid on the stock, whether the same shall have been paid in dividends or in cash, plus the increased value of the stock to be determined as follows: Add to the capital stock account the surplus account as shown by the books of the Company; deduct from this amount the amount of the preferred stock and any accrued dividends thereon; the total remaining to be divided by the total issue of no par value shares including this issue. It is hereby agreed that for computing under paragraphs 4, 5, or 6 the repurchase price shall be $.: (the price paid) less any unpaid balance of purchase price, plus the increase in book value over book value of $.: at time of purchase, both per audit report or, if none, Company's Final Balance Sheet for previous fiscal year. 3. Until paid for the stock shall be deposited with the Company and shall be paid for by cash dividends or cash payments. 4. If the executive's connection *55 with the Company is terminated after the date of this certificate of stock, for any cause other than death, no matter in whose name it may stand the stock must be reassigned to the Company within ninety (90) days after such termination on the payment by it of the amount paid hereon, whether same shall have been paid in cash by the executive or in dividends thereon, plus the increased value of the stock to be determined as set forth in paragraph two. 5. In case of the death of the executive, the stock shall be and become the property of his wife, if married, and if his wife survives him, and the Company shall have the right within two (2) years from the date of the death of such executive to repurchase the said stock from his wife, or her legal representatives, by paying therefor the amount paid, whether the same shall have been paid in cash by the executive or in dividends thereon, plus the added value of the stock to be determined as set forth in paragraph two. Upon the tender of that amount, the wife of the deceased executive, or her legal representatives, shall execute such assignment of the stock as may be necessary to transfer it to the Company and upon her or their failure *56 to do so, the Company shall have the right to make a deposit to the credit of such wife or her legal representatives of said amount in some Bank or Trust Company, selected by the Company, and thereupon all interest of said wife, or her legal representatives, in and to said stock, or the proceeds thereof, shall cease and determine. 6. In case of the death of the executive leaving no wife surviving him the Company shall have the right within ninety (90) days of the date of the death of such executive to repurchase the stock by paying therefor the amount paid, whether the same shall have been paid in cash by the executive or in dividends thereon, plus the added value of the stock to be determined as set forth in paragraph two. Upon the tender of that amount the legal representatives of the deceased executive shall execute such assignment of the stock as may be necessary to transfer it to the Company, and upon their failure to do so the Company shall have the right to make a deposit to the credit of the legal representatives of the deceased executive of said amount in some bank or trust company selected by the Company, and thereupon all interest of the legal representatives of said deceased *57 executive and of his heirs in and to said stock, or the proceeds thereof, shall cease and determine. 7. This stock shall not be sold or transferred at any time without being first offered to the Company for repurchase at a price as determined by paragraph two hereof. There was no definite plan by which the Executives Stock was distributed among petitioner's executives and principal officers. The recipients, limited to about 10 to 15 men, were selected in the early years by L. C. Walker, later by discussions between L. C. and Shaw Walker while both were interested, and finally by Shaw Walker. No member of the Walker family owned any shares of Executives Stock. During the taxable years petitioner's shareholders who owned both Executives Stock and regular common stock held less than 8 percent of the combined total of such stocks. The Executives Stock was not used by the Walker family as a device to build up their equity in or their control of the petitioner. Management used the Executives Stock issue as an incentive to retain the services of and to reward its principal officers and executives; the issue was not used by management as a means of raising capital. It viewed the distribution *58 to executives as compensatory in nature since the executive received dividends and the increase in book value while he or his widow held the stock. Petitioner has always repurchased the Executives Stock offered to it by its shareholders. After the petitioner had been given the right of first rejection, Executives Stock could be sold to the public. When petitioner offered Executives Stock to its principal officers and executives, sometimes referred to as its "executive pension plan," management assured them that petitioner would repurchase such stock according to the terms printed on the stock certificate. Because of such assurances, management considered petitioner morally, if not legally, obligated to repurchase the outstanding Executives Stock. Accordingly, in 1952, when the book value of its stock was about $62 a share, petitioner set up an account on its books representing the estimated possible liability under its "executive pension plan." In its balance sheet for fiscal 1952 the amount of such liability was reflected as $607,423.46. Each year thereafter through 1962, the amount of such estimated possible liability was increased; also each year thereafter through 1962 the book *59 value of petitioner's stock increased. For the taxable years 1955, 1956, and 1957 petitioner's balance sheets showed its estimated possible liability on outstanding Executives Stock as $803,190.26, $1,039,240.26, and $1,228,725.76, respectively, at a time when the book value of its stock was $83.17, $94.48, and $106.78, respectively. This "reserve" was not set up to meet any liability that was fixed at that particular time. Shares of Executives Stock outstanding were - June 30, 1955
14,026
June 30, 1956
13,548
June 30, 1957
14,098
June 30, 1958
14,198
Petitioner did not statistically compute the amount of this estimated liability on Executives Stock outstanding, but it did use the repurchase price of such stock in the hands of widows and heirs as a partial measure thereof. As to these shares at the end of the taxable years, petitioner estimated their repurchase price as $565,397 for 1955, $579,038 for 1956, and $760,509 for 1957. No funded reserve was maintained by petitioner for the repurchase of the Executives Stock, and the "executive pension plan" liability account on its books and balance sheets represented merely a segregation of surplus. Bank Sales
*60 Banks were an important source of business to petitioner for many years prior to the taxable years. In or about 1917 petitioner issued its first catalog of banking equipment. During the taxable years it used a supplementary catalog of modern banking equipment. The market for banking equipment was of sufficient importance to petitioner that it developed some specialty items therefor including tellers' equipment. Sales to banks were made by petitioner, by petitioner's branch offices, and by dealers that handled petitioner's equipment and products. In the normal conduct of its business petitioner maintained substantial bank balances in each city where a branch office operated since the receipts from the branch office were deposited in one bank account and petty cash funds in another. The total balance in the various petty cash accounts aggregated about $100,000 at all times, but the balances maintained in the other bank accounts varied from $10,000 to $25,000, each depending on the size of the branch and the size of the bank, except that the New York branch required a balance of about $100,000 for operational purposes. These operational balances were maintained regardless of additional *61 amounts deposited for other purposes. Prior to 1954 petitioner's management decided that it would substantially increase its bank sales if it approached banks properly and distributed its deposits properly among them. At that time petitioner's bank sales were about $200,000 a year. In 1954 petitioner intensified its efforts to effect bank sales by making deposits with banks that were potential customers. The size of the deposit and the balances maintained depended upon the business available from the bank. Where the depository relationship failed to produce business or produced insufficient business, petitioner adjusted its balance downward or closed out the account and transferred its funds to another bank with a better business potential. In some instances petitioner agreed with the purchasing bank that its remittances could be credited to petitioner's bank account which would be left on deposit with the purchasing bank for a period of time. Management consulted with bank officials about petitioner's initial deposit and the minimum balances that would have to be maintained to insure that the depository bank would give consideration to petitioner's equipment and products in making *62 its future purchases. Even where a depository relationship existed, petitioner's prices for its equipment and products had to be competitive in order to secure the bank's business. The table which follows reflects petitioner's sales to depository banks in cities where it operated branch offices and to nondepository banks in such cities for the years stated. The table also reflects the total bank balance maintained in such depository banks. The table does not include sales to banks by dealers who purchased from petitioner the equipment and products which they resell to banks, or sales to Hackley Union National Bank in Muskegon, petitioner's principal depository, or the Muskegon Bank & Trust Co. Sales to
Year
Non-De-
Ended
Depository
Banks
pository
June 30
Balance *
Sales
Banks **
1954
$1,751,000
$189,900
$116,000
1955
1,833,000
302,700
179,700
1956
2,185,000
364,700
204,100
1957
2,718,000
598,400
175,300
1958
3,486,000
508,100
1959
4,797,000
524,100
1960
4,790,000
634,100
1961
4,636,000
666,100
1962
4,809,000
710,400
*63 Management believed that its increased bank sales represented additional business that it would not otherwise have had and that such business was secured without proportionally increasing the cost of operating its branch offices. Petitioner's profit on its bank sales approximated 27 to 30 percent. Petitioner did not retain any of its earnings specifically for the purpose of promoting its bank sales business or its bank equipment business. Fixed Costs In operating its business petitioner's costs were both fixed and variable. Many operating costs at its branch offices were fixed, such as rentals under leases with terms up to 25 years, the salaries and wages of trained salesmen and executives at such branch offices and other salaries and wages allocable to branch operations. The petitioner's total annual expenses for salaries and wages (other than the salaries and wages of factory personnel) were $2,692,253.81 for the taxable year 1955, $3,112,531.96 for the taxable year 1956, and $3,223,238.62 for the taxable year 1957. More than one-half of these expenses represented salaries and wages of employees in petitioner's branch offices and other salaries and wages allocable to such *64 operations. During the taxable years petitioner was obligated to pay about $300,000 per year for space occupied by its branch stores and warehouses. Large inventories of finished goods were maintained by petitioner at such branches. Another fixed cost of the petitioner was its liability for various taxes including social security and unemployment, intangibles, privilege fee, business receipts, and real and personal property taxes. On its income tax returns for 1955, 1956, and 1957 petitioner claimed and was allowed deductions for these taxes in the aggregate amounts of $303,025.83, $381,923.58, and $421,895.44, respectively. Some plant costs of the petitioner were fixed to the extent that its executives and employees had to be paid whether business was good or bad. Petitioner's employees were protected by a job security policy under which no employee with over two years of service was fired. In times of declining business petitioner closed the plant for a day or more each week, but the cost of fringe benefits, i.e., group hospitalization, pensions, retirements, life insurance, etc., remained unchanged even with the reduced work week. A pension plan for its employees was adopted *65 by petitioner in 1951. From time to time thereafter the plan was amended. The original pension plan and the plan, as amended, were accepted by respondent as meeting the requirements for exemption under the Internal Revenue Codes of 1939 and 1954. During the taxable year 1957 petitioner was preparing to enlarge the past service benefits under its pension plan. The indicated cost of funding these benefits was actuarially estimated at between $200,000 and $400,000 during fiscal 1958. Management anticipated that increased benefits under the pension plan would have to be provided in later years, and such increased benefits were subsequently provided. On its income tax returns for the years 1954 through 1962 petitioner deducted and was allowed the following amounts for contributions to its pension plan and for fringe benefits for the employees covered in each year: Year
Ended
Pension
Fringe
Employees
June 30
Plan
Benefits a
Covered b
1954
$279,508.00
$ 97,643.99
1,491
1955
131,455.00
93,728.49
1,502
1956
120,580.15
128,356.90
1,759
1957
95,037.00
195,912.57
1,575
1958
169,894.00
226,519.42
1,546
1959
137,363.00
241,379.84
1,534
1960
456,085.00
283,178.38
1,588
1961
437,939.00
378,335.14
1,520
1962
490,882.00
348,535.51
1,541
*66 Dividend Distributions and Earnings Retained For the fiscal years 1948 to 1962, inclusive, petitioner paid dividends on its preferred, common, and executives stocks as follows: Year
Dividends Paid On
Ended
Total Dividends
Executives
Preferred
June 30
Paid
Stock
Stock
1948
$397,670.02
$37,678
$35,400.00
1949
590,529.47
56,842
34,368.00
1950
638,534.15
65,130
32,417.50
1951
635,884.15
65,130
29,767.50
1952
576,857.50
61,017
28,952.50
1953
638,901.68
69,430
28,485.00
1954
510,750.85
56,504
21,457.50
1955
629,646.70
70,380
18,280.00
1956
792,604.57
89,322
1957
856,071.51
98,690
1958
$673,177.62
$78,092
1959
788,844.42
85,562
1960
842,464.45
85,583
1961
601,543.66
60,559
1962
845,082.72
87,708
During the taxable years petitioner's dividend distributions aggregated $5 per share in 1955, $6.50 per share in 1956, and $7 per share in 1957. At the June meeting of its board *67 of directors in each taxable year, petitioner's treasurer reported on the financial condition of the company and its capital requirements. Among the capital requirements included in the treasurer's reports, some of which appeared in each report, were the following: a new factory building; increases in accounts receivables; substantial deposits in additional banks; increases in inventories; new catalogs; expanded program of national advertising; new machinery and equipment; numerous smaller requirements; improved pension plan; contributions to charities, particularly the L.C. and Margaret Walker Foundation; and current operating needs. The board of directors considered the various capital requirements as reported at each June meeting but fixed no exact dollar amount therefor and created no funded reserves to meet any of its capital requirements. The net income after taxes distributed and retained by petitioner during each of the fiscal years 1947 through 1963 was as follows (cents omitted): Year
Percentage
Ended
Net Income
Amount
Amount
Distributed
June 30
After Taxes
Distributed
Retained
(%)
1947
$1,398,287
$402,657
$ 995,629
29
1948
1,525,455
397,670
1,127,785
26
1949
1,440,334
590,528
849,805
41
1950
1,459,453
638,534
820,919
44
1951
1,721,730
635,884
1,085,846
37
1952
1,485,974
576,857
909,117
39
1953
1,385,296
638,901
746,394
46
1954
1,328,946
510,750
818,195
38
1955
1,460,655
629,646
831,009
43
1956
2,490,240
792,604
1,697,635
32
1957
2,519,342
856,071
1,663,271
34
1958
1,958,670
673,177
1,285,492
34
1959
1,864,523
788,844
1,075,679
42
1960
2,102,250
842,464
1,259,785
40
1961
1,572,867
601,543
971,323
38
1962
1,590,233
845,082
745,150
53
1963
1,293,717
725,824
567,892
56
*68 During each of the calendar years 1954 through 1958, L. C. Walker and Shaw Walker were in the following individual income tax brackets: Calendar
L. C. Walker
Shaw Walker
Year
(%)
(%)
1954
84
78
1955
81
78
1956
89
81
1957
91
87
1958
91
78
The Timer, Its Development and Production During World War II petitioner developed a method of applying carbon strips to forms, such as checks and pay statements, which is known as Kopi-Spot. During the postwar period, this has been the most rapidly expanded portion of its business, accounting for about 10 percent of its gross sales during the taxable years. Petitioner's activities in developing and selling Kopi-Spot products required detailed studies of the payroll systems of many customers and potential customers and the Timer was conceived of and developed as an adjunct to petitioner's Kopi-Spot products. L. K. Straus was in charge of sales of petitioner's Kopi-Spot products. During the late 1940's he came to the conclusion that the most costly aspect of payroll accounting was the computation of elapsed time used as a basis for computing and allocating wages payable. He conceived of a machine which *69 would simplify payroll accounting in all of its various aspects by recording the time when an employee began work on a particular job and the time he ended work, and which would compute and record the time elapsed between the two points. In the late 1940's he began the development of a machine which became known as and is referred to herein as the Timer. Prior to or in 1950, L. C. Walker became interested in Straus' Timer. He had petitioner reimburse Straus for such expenses as could be documented, and from and after January 1950, petitioner bore the costs of development of the Timer. At all times material thereafter the proprietary rights in the machine remained in petitioner. Henry Straus, a brother of L. K. Straus, was one of the developers of the Univac computer and one of the founders of the American Totalisator Company, Inc., sometimes referred to herein as American. Henry Straus and Arthur Johnson, chief engineer for American, were killed in an airplane accident on October 28, 1949. Prior to his brother's death, L. K. Straus had done some work with him and Johnson on an automatic time recording device. After the death of his brother, L. K. Straus employed an engineer, *70 Dolph Gobel, to do some experimental work to develop an elapsed time computer. Gobel made his first experimental model during January and Febraury 1950. Gobel's second experimental model was an electro-mechanical device which computed elapsed time but would not indicate on a card either the starting or ending time. It was necessary to have another machine perform the latter function. This model, designed to illustrate a principle, was not intended as a manufacturing prototype (i.e., a hand-made model physically similar to a machine that is to be mass-produced), and could not be manufactured as a commercially practicable machine. Straus was not satisfied with this experimental model as he wanted a single machine which would perform both functions. In Febraury 1950, Straus engaged a Chicago patent attorney, George H. Simmons, to advise him whether his method for recording and computing elapsed time was patentable. Simmons concluded that the Timer was patentable and started work immediately on the patent and other mechanical developments. On June 29, 1950, Simmons filed an application for a patent on the Timer listing L. K. Straus as the inventor. Prior to March 1951, petitioner entered *71 into an informal arrangement with American. As a result of that association and in collaboration with Simmons further models of the Timer were developed. Oscar Levy and H. C. Robinson have been vice presidents of American since 1950. They examined Gobel's model and concluded that the basic idea was sound but that the functions performed could be best accomplished by a differential gear arangement. Robinson spent considerable time developing his idea and by March 30, 1951, had prepared a sketch of a machine and a memorandum describing its functioning. Robert Stevenson, a designing engineer with American, built a model that demonstrated Robinson's differential gear concept in 1951. Prior to 1952, Stevenson prepared a set of schematic drawings. Straus authorized Stevenson to make a model based upon such drawings, and during 1952 Stevenson built an experimental model of an elapsed time computed with two chutes. A card inserted in a slot or chute on one side of the machine would record beginning time and its insertion in a slot or chute on the other side would record ending time and compute the elapsed time. Stevenson's double-chute model was the first machine to embody the principle *72 which is now being used in the Timer, but it was intended only to test the practicability of an idea; not to be a manufacturing prototype. Robinson and Levy concluded that the engineering staff of American was not equipped to complete the production design for a machine like the Timer. Accordingly, in 1953, they selected Lord & Associates of New York to produce a manufacturing prototype. The machine produced by Lord Associates was a substantial improvement over Stevenson's double-chute model in many ways, and particularly because it contained a single chute into which cards were inserted. In December 1953, Levy took the Lord & Associates model to Simmon's office in Chicago where it was tested. It did not function efficiently. At or about this time, and on December 22, 1953, the United States Patent Office issued Patent No. 2,663,497 to L. K. Straus for an elapsed time computer based upon the application filed by Simmons on June 29, 1950. The application and patent were based on the Gobel model. Straus had assigned his patent rights to petitioner on November 13, 1953. While the Lord & Associates' model contained new manufacturing ideas and arrangements, such as the single-chute *73 feature and electro-magnet controls rather than purely mechanical controls, it fell short of being a manufacturing prototype. Their machine was turned over to Stevenson to build another working model. Thereafter, and in 1954 or 1955, Stevenson built a single-chute prototype model which was delivered to Simmons late in 1955. From the first edition of Stevenson's single-chute model until the final edition thereof, (in November 1958) which led to the manufacture of tools, dies, jigs and fixtures, there were constant changes, additions and improvements of this machine. On March 9, 1956, Straus advised L. C. Walker as follows: Dear Mr. Walker: I am dictating this letter in the office of the American Tote Company [American Totalisator Company, Inc.] in the presence of Mr. Robinson and Mr. Levy. The Timer is now running perfectly and many changes that were made are obvious improvements. The cost of the reconstruction was approximately one-half of the cost of the new model because approximately one-half of all the parts were remade. The engineer at the Tote Company has completed the work that he wanted to do but shipment of the machine to Muskegon is going to be delayed two more *74 weeks to perfect the "entrance guide" for the cards. While this is a minor detail, it does affect the time required to insert the card. We do not see how an extensive test in Muskegon will contribute much in this development. After you have had the opportunity to be convinced of the satisfactory operation, please have it returned to the Tote Company because it is advisable to conduct an engineering study of the tooling problems and production methods before trying to establish a cost for one, two or five hundred units. I am glad I came down to Baltimore because I am convinced that the Tote people are making time as quickly as possible consistent with safety. I shall talk with John Page on the telephone Monday morning about the changes that he and Mr. McKinley suggested. Mr. Levy's letter of September 17, 1955, written to Shaw, estimates that the completion of the work will cost approximately $4,000. On or about June 12, 1957, petitioner ordered two prototypes of the Timer through American or its subsidiary, General Register Corporation. On the same date, Straus advised Harrington that petitioner was committed to the manufacture of a production model and that an estimate would *75 be made of the cost of tooling, the cost of producing 300 Timers, and the cost of producing Timers in thousands. Also, on June 12, 1957, Straus advised Shaw Walker of petitioner's commitment for the Timer machines, enclosed a copy of his letter to Harrington, and suggested that petitioner should start immediately to investigate the market for suitable card stock as the revenue from the machine would be on the basis of sale or rental plus the sale of cards. The two prototypes were to be produced, insofar as possible, from manufacturing drawings prepared by General Register. The preparation of such drawings on a machine with as many interrelated parts as the Timer was a complicated procedure and the prototypes were completed in about eight or nine months. By early March 1958, the two manufacturing prototypes of the Timer were delivered to petitioner and were put on exhibit in petitioner's New York and Newark, New Jersey, offices for approximately 20-30 weeks. About 1,000 business firms were invited, by promotional material and through telephone solicitation to members of their management, to the New York and Newark showings. After the prototypes were completed by General Register, *76 the next stage in the development of the Timer was to make a thorough test to determine their life and reliability. After such testing, the next stages in order would be (1) to obtain a test under operating conditions rather than laboratory or shop conditions, and (2) mass production or general manufacturing. It is normal in the development of any machine, even after the production of successful prototypes, to have a small run of machines which are put into the field for testing, and petitioner admits that it is folly to proceed in the manufacturing of a new product of this nature without such field testing. These stages in the development of the Timer were recognized by petitioner and L. C. Walker as early as June 15, 1953, on which date L. C. Walker had outlined such a development program to American. Between March and October of 1958, petitioner and American held a series of discussions relative to a program for tooling and the production of Timers. The tooling program was to be of such quality as to produce parts for 10,000 Timers, but the production program related to only 50 Timers because petitioner felt that it was necessary to have valuable field experiences under various *77 operating conditions before proceeding with a big production run. The 50 machines were to be placed in the field and studied to ascertain whether petitioner had a commercially acceptable machine. The field test would also provide sufficient operating experience on customers' premises to warrant the reliability of the machine for further production and its acceptability. If the machines had not been acceptable to the public, both in concept and in the functioning of the particular machine, the Timer project would have been abandoned at that time. Under date of October 30, 1958, American advised L. C. Walker, as chairman of the board of petitioner, that the cost of tooling for the production of commercial grade units of the Timer was $55,000, that petitioner was to pay the full cost thereof, that the tools would then be the property of the petitioner, that American would be responsible for the maintenance and replacement of these tools, at its own cost, up to a production of 10,000 units, and that the tools would be suitable for the production of 10,000 units. On the same date, American advised petitioner that the cost of 50 Timers, after completion of the $55,000 tooling program, *78 would be $800 each, that this price included no manufacturing profit, that delivery of machines would commence 9 months from the signing of the manufacturing order, with production at the rate of 10 machines per week thereafter, and that the machines would be of full commercial quality with a life expectancy of 5 years which could be extended to 10 years without excessive repair costs. Under date of November 24, 1958, L. C. Walker advised Levy and American that "You can consider this an order for the tools for producing TIMERS in quantities - total, $55,000." Walker also advised Levy and American: You may also consider this an order for fifty TIMERS at a cost of $800 apiece. The shipment of these and the handling of them in the field is covered in your letter, and is satisfactory. I trust this letter, your two letters, and our past correspondence, cover in the main our relationship. At least, we so accept them. However, the correspondence has been over such an extended period that I think we shall have to depend on two fair-minded men to treat each other as engaged in a cooperative spirit on a new venture, which may require some adjustment from time to time as we proceed. *79 The 50 Timers ordered by the petitioner on November 24, 1958, were manufactured by General Register Corporation. Each machine contained about 800 parts, some of which were supplied by subcontractors. At the time General Register undertook the manufacture of the 50 Timers, there were no manufacturing drawings in existence except such as had been prepared in producing the two prototypes. General Register prepared the necessary manufacturing drawings. Petitioner's first order for one of the 50 Timers was taken on or about December 6, 1959. It placed its first Timer with a customer on or about April 1, 1960. It placed the bulk of the 50 Timers with customers during the next 12 to 14 months. About 45 of the 50 Timers were actually placed in the field and about 35 of them were still out on lease in late 1963. In the latter part of 1959, American advised petitioner that substantially new tooling would have to be manufactured to achieve an acceptable production cost per unit. Difficulty was encountered in estimating Timer tooling due to uncertainty as to the quality and rate of production that the market would bear, and the large effect that variations in either of these items had on *80 unit cost. Negotiations between petitioner and American continued until June 1961. On May 9, 1961, Patent No. 2983443 was issued on Simmons' second application. It covers the Timer as now produced and marketed by petitioner. From the first installation of a Timer in April 1960 through the calendar year 1961, petitioner had trouble with the Timers being tested in the field. In the spring of 1961, Leonard Davis of petitioner and Straus conferred with L. C. Walker about the Timer. Davis reported the problems they had encountered in the field testing. Walker's reaction was that this was the reason he wanted the machines tested before going on to a bigger program. On June 20, 1961, Straus wrote Levy and Robinson of American as follows with respect to the development and progress of petitioner's Timer program: Dear Oscar and Robbie: It appears that the experience we have gained in the lease of 45 Timers over the period of the past 18 months and the improvements made now justify our taking the next step in this costly venture. The modification of and replacement of those Timer parts originally made of materials which turned out to be unsuitable seems to have ended the service *81 problems with which we had been plagued. Since the completion of this work, service calls have in our opinion dropped to a practical minimum. Therefore, this letter will authorize you to have made such additional tools and of such quality that you can furnish us with up to ten thousand Timers on a production-run basis. It is understood that $255,000.00 is to be the total required for additional tools to manufacture up to ten thousand Timers and that American Totalisator Company assumes full responsibility for the maintenance and replacement of these tools and addition of any others required to complete this number of machines. Also included in this amount is the installation of an assembly line to build Timers. It is also understood that a list of all the tools provided under this arrangement will be furnished to Shaw-Walker as such tooling is provided and that, as before, this tooling and any other tools heretofore paid for by Shaw-Walker belong to Shaw-Walker without restriction. If agreeable to you, we would like to have you bill us monthly for the cost of tools completed during the preceding month. We are making studies to determine the number of Timers we will ask you *82 to make for us in the initial production run and the rate of deliveries we will need. It is our understanding you propose to charge us $800.00 each for the first three hundred Timers and not over $450.00 for the next twelve hundred Timers if ordered at a rate of fifty per week. Mr. Shaw Walker would like to discuss this with you and me when he is in New York, which I hope can be in the near future. On August 23, 1961, American notified petitioner of an additional tooling cost of $8,719 for design changes, making the total tooling cost for the new design $263,719; an additional charge of $2,000 for 200 hours of engineering time to make drawing changes so as to bring original drawings up-to-date as required in making changes for production manufacture; a unit price per Timer incorporating the design changes of $855 each for a quantity of 300, or $455 each for an initial order of 2,500. If an initial order of 300 Timers was placed by September 1, 1961. American anticipated a delivery schedule of one Timer per day on February 15, 1962, three Timers per day on March 15, 1962, five Timers per day on April 15, 1962, and completion of the 300 Timers between June 15 and July 1, 1962. *83 Under date of September 5, 1961, Straus advised American that Shaw Walker had asked him to place an order "for an initial run of Timers from the new tooling." Accordingly, petitioner placed an order for 300 Timers at a cost of $855 each. In concluding his letter, Straus stated: "Our field experience with the fifty Timers in daily operation seems to indicate that we have overcome all mechanical problems. Our immediate objective is to get this program under way as quickly as possible." American did not have the facilities to manufacture Timers. It investigated several manufacturers in the Baltimore area and finally selected General Engineering Company of Glen Arm, Maryland, which had been a supplier of certain ticket issuing machine parts for American. American entered into a contract with General Engineering for the manufacture of the 300 Timers ordered by petitioner, the first machine to be produced by about February 1962. The manufacturing drawings prepared by General Register in connection with the production of 50 Timers were given to General Engineering at the time it received the order for 300 Timers. General Engineering was informed that the drawings would need checking *84 since it had been difficult to keep them up to date during the mechanical changes of 1960 and 1961. General Engineering made approximately 500 separate engineering changes on the drawings in producing the 300 Timers. Petitioner was led to believe that General Engineering would produce commercially acceptable machines and did not anticipate defective Timers. The machines produced by General Engineering were not reliable, and did not function properly. General Engineering completed its first machine in February or March of 1962. By the end of April or the first of May 1962, it had delivered four or five machines. The first machine did not operate and the others jammed when Timer cards were inserted. In December 1961, Shaw Walker visited various cities in South Carolina looking for a plant site. On March 12, 1962, petitioner engaged an architectural firm in Florence, South Carolina, to design and supervise the construction of a new plant in Florence. On December 10, 1962, petitioner engaged Boyle Construction Company of Sumter, South Carolina, to construct an industrial plant, which was completed in the early spring of 1963. Prior to the employment of the architectural firm and *85 on February 1, 1962, petitioner placed an order with Hamilton Manufacturing Company, Hamilton, Ohio, for a special machine designed for high volume production of Timer cards. The machine, installed in petitioner's plant at Florence, will produce nothing but Timer cards. The first Timer cards produced in the Florence plant were received in September 1963. The machine in the Florence plant can produce Timer cards at the rate of 60,000 to 90,000 cards per hour. Approximately 1,000,000 cards a year are needed for the Timers actually in use. Petitioner recognizes that it has excess capacity for the production of Timer cards but expects the Timer program to absorb this excess capacity. The petitioner has continued its efforts to improve the operation of the Timer. In October 1962, it employed Dolph Gobel, an engineer qualified by experience and training to design and develop machines, to serve as a consultant for a period of 6 months. Thereafter, petitioner hired Gobel as a full-time research and development engineer. The Timer, Its Marketing and Financing From the beginning of the development of the Timer, petitioner planned to retain all proprietary rights in the machine. It has *86 never manufactured a machine, and it did not at any time plan to manufacture the Timer in its own plants. Shortly after it started the development of the Timer, petitioner's management decided that it would procure Timers by having them manufactured for it by American. The relationship between petitioner and American has been based throughout upon the understanding that petitioner owned the proprietary rights to the Timer. The working arrangement between petitioner and American was not based upon a specific written contract. The various agreements entered into with respect to the tooling, production, servicing, and financing of the Timer program were reached after negotiations between managements who arrived at certain understandings thereafter confirmed by correspondence. On June 13, 1953, L. C. Walker wrote American that the progress in the development of the Timer made it advisable to establish a program that was understood and agreeable to all parties concerned. He suggested that the Timer program should be operated in stages which included: (1) the work American had done and was having done, for which petitioner enclosed its check; (2) the manufacture of a small run of machines *87 after the model proved to be acceptable, which would be tested in the field with different businesses to see if such machines would prove their value and if, in petitioner's judgment, it could be marketed successfully; (3) the training of a sales organization backed by a service crew for field inspection and repairs; and (4) that petitioner would have "to supply ample capital to finance the machines on an annual rental basis since this would be the only way, in my opinion, this venture can survive." Thereafter, the Timer program followed substantially the stages outlined by L. C. Walker. Since June 1953 until the present time, American has billed petitioner for the direct costs of its development work on the Timer, and all amounts billed have been paid. As early as 1953, the management of petitioner concluded that the Timer could be successfully marketed only if lease arrangements as well as purchase arrangements were offered to customers. Petitioner's management believed that potential customers would not be willing to make the investment required to buy new machines as expensive as the Timer until their value to users had been proven, but that they would be willing to pay annual *88 rentals in order to determine if the machines were desirable for them. During the taxable years petitioner's management anticipated that a five-year rental would be required to recoup the costs of purchasing machines from American, to recoup the cost of its sales force in placing Timers with customers, and to return a normal profit to it. The decision of management to lease the machines over a five-year period was in effect in June of 1955 through June of 1957. The petitioner has been engaged in the card business for many years. Early in the Timer program petitioner's management recognized that the production and sale of Timer cards would be an important part of such program. Management realized that Timers would consume a tremendous number of cards with the increased use of Timers, and it anticipated that the manufacture and sale of Timer cards would be an additional source of revenue even though the margin of profit was small. Timer cards could have been manufactured on the machinery in petitioner's plant at Muskegon but their production would have been uneconomical. Timer cards must be cut to a very high degree of precision which requires special machinery. During the taxable *89 years management recognized that petitioner would eventually need a new machine capable of producing Timer cards in large volume and that petitioner would have to build a new plant to house such special machinery. In marketing the 50 Timers placed in the field for test runs, petitioner encountered sales resistance because of the type of card being used in the Timer which would do no more than show the elapsed time. Early in 1960, petitioner concluded that its customers' time analysis systems would be much more efficient if the cards to be used in the Timers were redesigned. It decided that cards with holes punched along the edges would be used instead of plain cards. The newly developed card, called "sort-matic," enabled customers to employ a needle-sorting method to sort cards which had been punched into appropriate categories, such as, direct and indirect labor and time spent on a particular job. When the first Timer was installed at a customer's plant in April 1960, it was discovered that the new card jammed the machine. The use of the new card required a redesign of the card-sensing mechanism and the modification of the Timers already assembled from the test run of 50 Timers. *90 The Timer cards used by petitioner in its commercial installations prior to September 1963 were purchased primarily from an outside manufacturer. These cards were resold by petitioner to its customers at a loss. Since September 1963, Timer cards produced at petitioner's plant in Florence are being sold to customers. In 1960, Davis was the only sales person engaged in leasing Timers for petitioner. Shortly prior to January of 1963, petitioner hired six additional salesmen, put them through a training course, and placed them in the field leasing Timers. As of July 1, 1963, there were 53 Timers installed and in operation on the premises of customers, leases were signed with six additional customers but the Timers were not yet installed, more than 200 machines were on hand which petitioner had not been able to lease to customers, and the remainder were in process of manuufacture or reworking. During the taxable years petitioner was unable to make a precise estimate of the amount of money required to produce and market Timers and Timer cards. Management planned to finance the Timer program with earnings, since it was against petitioner's policy to finance undertakings with borrowed *91 funds. Management expected the Timer program to show a loss during its early years, and it would not have entered into the development of the Timer unless it had had the necessary funds. During the taxable years no specific portion of petitioner's earnings was set aside for use in the Timer program, nor was any fund or funded reserve set up to cover future expenditures on the Timer project. If the public had not accepted the concept of the Timer during its early development (which includes the years in issue) it would have been abandoned by the petitioner. Petitioner received its first revenues from the Timer ( $675) in fiscal 1960, and received revenues totaling $6,750, $10,701, and $17,898 in fiscal years 1961, 1962, and 1963, respectively. Petitioner's total cash outlay from 1950 through June 30, 1963, according to its books and records for the development, production, and marketing of the Timer and for the construction and equipment of its plant at Florence was $1,551,703. Petitioner expended certain funds during the course of its development of the Timer for which it had no records, or the expenditure was not identifiable. By June 30, 1958, petitioner's disbursements *92 for development of the Timer totaled $134,901. For each of the next five years its disbursements for Timer and the Florence plant and the total for the period 1959 through June 30, 1963, were as follows: 1959 - $136,178; 1960 - $10,653; 1961 - $15,633; 1962 - $315,963; 1963 - $938,375; and total - $1,551,703. Burden of Proof In June 1960 respondent complied with the notification provisions of section 534(b), Internal Revenue Code of 1954, regarding petitioner's fiscal years ended June 30, 1955, 1956, and 1957. On or about September 19, 1960, petitioner timely filed a section 534(c) statement, purporting to set forth the grounds and facts relied on to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business. The grounds listed therein with respect to each of the taxable years were as follows: 1. To meet the needs of the petitioner for working capital with which to conduct the normal operations of the business. 2. To provide funds necessary for the replacement of its fixed assets. 3. To provide funds for the development, production and distribution of a new product, the Timer. 4. To *93 provide funds for the repurchase of its Executives Stock pursuant to a plan upon which the holders of this stock had relied and were then relying. 5. Because, pending their use for the above purposes, the petitioner could and did use a substantial portion of its retained earnings and profits as a means for increasing its sales to banks and thereby increasing its operating profits. On December 9, 1960, respondent issued a statutory notice of deficiency to petitioner which determined deficiencies for the three taxable years herein aggregating $1,580,366.50, all of which represented its accumulated earnings tax liability under section 531, Internal Revenue Code of 1954. Such deficiencies were based upon alleged accumulated taxable income as follows: 1955
$ 831,009.07
1956
1,696,717.07 [1]
1957
1,662,836.21 [1]
Thus, the respondent's determination and contention both are, in effect, that the reasonable needs (including *94 the reasonably anticipated needs) of the petitioner's business did not exceed the amounts which petitioner already had (accumulated earnings and profits of prior years) in readily available form and not being used or earmarked for use in its business. Ultimate Findings of Fact During each of the taxable years 1955, 1956 and 1957, petitioner permitted its earnings and profits to accumulate beyond the reasonable needs, including the reasonably anticipated needs, of the business. During each of such taxable years petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of dividing or distributing them. Opinion Section 531 of the 1954 Code imposes an accumulated earnings tax on the accumulated taxable income of every corporation described in section 532. The latter section applies the tax (with exceptions not here material) to every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533 provides that the fact that earnings *95 and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation shall prove the contrary by the preponderance of the evidence. Section 537 provides that the reasonable needs of the business includes its reasonably anticipated needs. Section 534 of the 1954 Code relates to the burden of proof in proceedings before this Court involving deficiencies in accumulated earnings tax. Before and at the trial and on brief petitioner has continued to urge that its section 534(c) statement was sufficient to place the burden of proof on the respondent. See Shaw-Walker Co., 39 T.C. 293. The position of the respondent has always been that the statement filed by the petitioner, lengthy as it may be, is nothing more than a generalized claim that petitioner needed all the profits and earnings which it retained, without setting forth amounts in most of the instances or facts sufficient to support the grounds stated therein. We have recently held that while the *96 burden of proof in accumulated earnings cases may be shifted by the filing of a proper statement under section 534(c), nevertheless, the ultimate burden of proving that the taxpayer was not availed of for the purpose of avoiding the income tax with respect to its shareholders remains upon the corporate taxpayer. Sandy Estate Co., 43 T.C. 361, and cases there cited. In American Metal Products Corporation, 34 T.C. 89, affd. 287 F. 2d 860 (C.A. 8, 1961), we pointed out that in order to shift the limited burden of proof under section 534(c), a taxpayer's statement must contain both grounds and facts, and even though the requisite grounds are stated the supporting facts may be insufficient from a lack of specificity. The necessity for the supporting facts to be substantial, material, definite and clear was further emphasized in J. Gordon Turnbull, Inc., 41 T.C. 358, 370 (on appeal C.A. 6). See also, I. A. Dress Co., 32 T.C. 93, affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976; Dixie, Inc., 31 T.C. 415, affd. 277 F. 2d 526 (C.A. 2, 1960), certiorari *97 denied 364 U.S. 827. After carefully reviewing the statement with respect to the grounds and the facts therein set forth, we have concluded that the facts alleged are insufficient to shift the burden to respondent. They lack the requisite specificity and definiteness envisaged by the statute. While the grounds and the facts alleged in its statement may have revealed petitioner's position to the respondent, R. Gsell & Co. v. Commissioner, 294 F. 2d 321 (C.A. 1961), we are unable to hold that petitioner's statement was sufficient to shift the burden to respondent. However, regardless of where the burden of proof lies, the affirmative evidence of record is sufficient to determine this case on its merits. Apollo Industries, Inc., 44 T.C. 1, on appeal (C.A. 1, Aug. 18, 1965); Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court; Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495 (C.A. 4, 1960), certiorari denied 362 U.S. 976; see also Raymond I. Smith, Inc. v. Commissioner, 292 F. 2d 470, 474 (C.A. 9, 1961), *98 certiorari denied 368 U.S. 948. Before considering separately the grounds and facts relied on by petitioner, it will be helpful to review some of the historical facts. Petitioner started business in 1899 with less than $3,500 capital and the issuance of 200 shares of $10 no par value common stock. It financed its business through debt, the issuance of preferred and common stock, and retained earnings. Except for the sales of Executive Stock, there has been no additional cash investment in common stock since the issuance of the first 200 shares. It was against the policy of the petitioner to borrow money and the last time it owed money to a bank was in 1938. It has never followed the practice of loaning money to its shareholders or providing them with personal luxuries. It sold approximately 5,000 products, maintained branch offices in various cities, and conducted an active, complex, nation-wide business with sales in fiscal 1956 and 1957 of over $24,000,000 in each year. In fiscal 1958 sales were almost $22,000,000. At all times material the business was controlled by the Walker family which owned 65 to 70 percent of its common stock. During the years in issue L. *99 C. Walker and his wife, and Shaw Walker owned nearly 60 percent of such stock and their income taxes would have been greatly increased if petitioner had enlarged its dividends. From 1908 through the taxable years L. C. Walker directed petitioner's business operations. The board of directors consisted largely of its officers, who were located at its plant where they were constantly in contact with each other. Many corporate matters were acted upon informally and ratified later by the directors if ratification was necessary. The dividends paid for the 10-year period (fiscal years) 1948-1957 ranged from a low of $397,670 to a high of $856,071. These averaged 38 percent of petitioner's net income after taxes. The dividends paid for the 3 years in issue were (rounded) $630,000, $793,000, and $856,000, while earnings retained in the business for these years were $831,000, $1,698,000, and $1,663,000. L. C. Walker and Shaw Walker were in the 81 to 91 and the 78 to 87 percent individual income tax brackets, respectively, during the taxable years herein. The first ground alleged by petitioner to justify its retention of earnings and profits in its section 534(c) statement, and still urged, *100 is its needs for working capital in the normal conduct of its business operations. For the taxable years 1955, 1956, and 1957, petitioner alleged its working capital needs were $9,000,000, $9,500,000, and $10,000,000, respectively. According to the allegations in such statement, management divided its working capital needs into three specific requirements, namely: (1) extending credit to customers; (2) carrying inventories; and (3) labor and other expense items, particularly the fixed expenses of its branch office system. In predicting its requirements the statement alleges that management took into account the following specific aspects which affected its business: (1) the temporary fluctuations anticipated during a fiscal year in the volume of its inventories and receivables; (2) its business cycle; and (3) the anticipated volume of its business. In its brief, petitioner cites and relies upon our decisions in J. L. Goodman Furniture Co., 11 T.C. 530, and F. E. Watkins Motor Co., 31 T.C. 288, and contends that this Court has consistently held that an accumulation of funds to meet the expenses of operation for at least a year is reasonable. Upon the authority *101 of these and similar decisions, petitioner submits that it was entitled to accumulate working capital equal to the cost of conducting operations for one year. Petitioner relies upon what has been termed a "rule of thumb." It has been described as a proper rule for administrative convenience but one that should rise to no higher level, Dixie, Inc., supra (C.A. 2 opinion at p. 528); Barrow Manufacturing Company supra; John P. Scripps Newspapers, 44 T.C. 453, 471. It has also been stated that the rule announced in the Goodman and Watkins cases, is not a controlling principle, and that each case must be decided by the needs of the particular taxpayer in the determinative year or years, Motor Fuel Carriers, Inc. v. United States 322 F. 2d 576, 579 (C.A. 5, 1963). Petitioner's reliance upon the rule of thumb announced by the cited cases is misplaced. We have carefully weighed the mass of evidence adduced by the parties including the statistical and economic analyses submitted by them. We recognize that the working capital requirements of businesses vary with the nature of the business, its credit policies, the amount of inventories *102 and the rate of turnover, the amount of accounts receivable and the collection rate thereof, and similar relevant factors. Smoot Sand & Gravel Corporation, supra, at p. 499. We recognize too that petitioner did not compute or operate its business under any average rate or turnover of its inventories; that it did not conduct or operate its business upon the basis of graphs, charts, formulas, statistics, etc.; that L. C. Walker, Guy Harrington, and Shaw Walker discussed and analyzed petitioner's working capital requirements and determined the amount thereof; and that their conclusion as to the amount needed annually was based upon their knowledge and experience derived from close daily contact with petitioner's business operations over a long period of years. We do not believe that a detailed discussion of the facts and arguments advanced with respect to the different theories will be helpful. Our findings show that petitioner had working capital available at the close of each taxable year in the following amounts, $9,014,372, $10,407,227, and $12,154,469. These amounts are in excess of the capital requirements claimed in its section 534(c) statement of $9,000,000, $9,500,000, *103 and $10,000,000. Reference to the tables in our findings discloses that petitioner's cash and cash equivalents alone exceeded its operating expenses for each taxable year, that the ratio of its current assets to current liabilities was 4.75, 3.89, and 4.70 to 1, respectively for the taxable years, that it maintained a liquid position in its operations since 43, 46, and 53 percent, respectively, of its total assets consisted of cash or cash equivalents. We have found that the working capital available to petitioner at the close of each taxable year was, in millions of dollars, $9.0, $10.4, and $12.2, respectively. The amounts thus found are far in excess of any amounts appearing as anticipated capital needs in the minutes of the meetings of petitioner's directors.
At year's end, namely, June 28, 1955, June 25, 1956, and June 28, 1957, when the operations for the year were considered, prospects for the approaching year were analyzed, and dividend action taken, it was customary for Harrington to give a report in which he referred to the capital requirements for the next year. While his reports referred to various capital needs of the petitioner, his only estimate that seemingly encompassed *104 its total capital requirements was made at the directors' meeting of June 28, 1957: "* * * that these requirements, [2] plus something for charity and the balances needed in our depository banks in the normal course of our business, can reasonably be expected to total 5 to 5 1/2 million dollars." This is roughly one-half of the amount now contended for. We also note that Harrington reported profitable years at each of these year-end meetings and that profits were anticipated for the next year. It is certain that the money petitioner had and kept tied up in United States Treasury notes and bills was not being used in the conduct of its business. These amounts during the years in issue were (rounded) 3.2 million, 4.8 million and 6.5 million and they ranged between 4 million and 5.2 million for the years 1958 through 1962. Elimination of this single item from petitioner's working *105 capital account would result in working capital of 5.8, 5.6, and 5.7 million for the years in issue. This factor alone makes Harrington's estimate at the director's meeting of June 28, 1957, of reasonable capital requirements of 5 to 5 1/2 million seem far closer to reality than petitioner's present contention of a need for 10 million as of such date. There is no need for us to determine precisely petitioner's reasonable needs for working capital to be used in the normal conduct of its business operations, or its reasonably anticipated needs for such purpose, during the years in issue. We are satisfied, and hold, that there was at least $3,000,000 of available working capital in the form of accumulated earnings and profits in each taxable year that was not used, needed or reasonably anticipated as being needed by petitioner in the normal conduct of its business operations. The second ground alleged by petitioner in its section 534(c) statement, and still urged, was its need for funds to replace its fixed assets. The petitioner's position is that its operating plant and the equipment were old and that in the taxable years it was faced with replacing them at costs many times their *106 original book value. The reports by the appraisers of Coats & Burchard Company are relied upon to support the increased cost of the buildings, machinery and equipment at petitioner's plant. Petitioner calls attention to the fact that its capital expenditures for the 9 years starting July 1, 1954, exceeded by $400,000 the total original cost of the fixed assets on its books at such date. It points out that its depreciation reserves are not funded and that its capital expenditures must come from its general cash funds. Our findings show in considerable detail the nature of petitioner's plant at Muskegon, the additions made thereto, the amounts expended for fixed assets over the period 1947 through 1963, and petitioner's accounting practice with respect to its fixed assets. Our findings also show that the additions to and the replacement of such fixed assets were made as and when management decided there was a need therefor, which was pursuant to a general policy of expansion and improvement. We have also found that such additions and improvements were not made pursuant to any fixed, definite, and certain plans. It has often been stated that *107 to justify the retention of earnings for the purpose of acquiring or replacing buildings or equipment for use in the business, the taxpayer must have specific and definite plans therefor; that retention of earnings cannot be justified where the future plans are vague and indefinite, or where the execution of the plans is postponed indefinitely. Barrow Manufacturing Company, supra; Motor Fuel Carriers, Inc., supra; Wellman Operating Corporation, 33 T.C. 162. Petitioner has been unable to point to, and we are unable to find, that it had definite and formal plans for expansion and replacement of its fixed assets. It had the recognition that accompanies the expansion and growth of a business that its worn and uneconomical assets would have to be replaced at sometime in the future, and that with the growth and expansion of its business, additions to its plant, machinery, and equipment would become necessary. However, petitioner's entire history is one of constant growth, and even though management did not formalize plans for expansion and replacement of fixed assets, we believe that on the facts *108 of this case, petitioner was justified in considering some part of its accumulations as reasonable for these purposes during the years in issue. John P. Scripps Newspapers, supra; Bremerton Sun Publishing Co., 44 T.C. 566. Considering the entire record on this aspect of the case, and giving proper weight to what petitioner in fact did in later years, Dixie, Inc., supra, at p. 430, we find that petitioner was reasonable in anticipating a need for $350,000 for these purposes for each of the years in issue. The third ground alleged by petitioner as justification for the accumulation of earnings was to provide funds for the development, production and distribution of a new product, the Timer. The facts with respect to the petitioner's activities in developing, producing, and distributing the Timer are set forth in our findings. It is clear therefrom that petitioner has devoted time and money in seeking to perfect this machine as an important addition to its Kopi-Spot products. From conception to the fiscal year 1963, the development and perfection of the Timer encountered difficulties, some of which were solved and some of which still remained *109 unsolved at the time of trial. The situation at the end of the taxable years in the Timer's development is critical, since management necessarily judged the financial requirements for the Timer project upon the known facts and the prospects for the future. On brief, petitioner frankly states that management "was unable to put a precise estimate on the capital which it would have to lay out to develop the TIMER and market it," but that, "it felt that it might lose something like one million dollars if the TIMER proved a failure." It also now contends that the best conclusions management could arrive at were that the marketing of the machine might consume all the petitioner's cash if the machine were a success, and that about $1,000,000 would be required to establish a Timer card facility and to carry the receivables and inventory connected with it. Petitioner contends that a taxpayer is entitled to retain earnings without becoming subject to the penalty tax to the extent that it requires capital for an effort undertaken in good faith to expand its existing business. It cites in support of this principle Breitfeller Sales, Inc., 28 T.C. 1164, 1168; Newman Machine Co., 26 T.C. 1030; *110 Crawford County Printing & Publishing Co., 17 T.C. 1404; and Lion Clothing Co., 8 T.C. 1181, but it is our opinion that the factual situations between the cited cases and the instant case are so different that these cases are of little value to us. Our findings show that petitioner had expended $134,901 on the development of the Timer from 1950 through the fiscal year 1958, plus some salaries, telephone, and travel expense that could not be identified. The record fails to disclose petitioner's expenditures for any given fiscal year prior to fiscal year 1958, so we will assume, for the purposes of this opinion, that petitioner's development expenditures at the close of fiscal 1957, 1956, and 1955 were in the same total amount as at June 30, 1958. In connection with petitioner's expenditures in development of the Timer, we note that it expended a total of only $162,464 during the three fiscal years following fiscal 1958, for a grand total of $297,365 through June 30, 1961. At June 30, 1957, the situation as to the machine was that petitioner had ordered two prototypes of the Timer from American, and Straus had advised Harrington that petitioner was committed *111 to the manufacture of a production model. Looking ahead, Straus also advised Harrington that an estimate would be made of the cost of tooling, the cost of producing 300 Timers, and the cost of producing Timers in the thousands. Straus' optimistic statement to Harrington in June of 1957 went far beyond the program outlined by L. C. Walker in his letter to American in June of 1953. Walker specifically provided for the manufacture of a small run of machines after a model had proved its acceptability in field tests with different businesses and if, in petitioner's judgment, the machines could be marketed successfully. The record shows that the two prototypes ordered in June of 1957 were delivered to petitioner in March of 1958 and thereafter were put on display in New York and Newark. In November of 1958, petitioner ordered the tooling for and the production of 50 Timers that were placed in the field for testing and the first of these Timers was placed with a customer on or about April 1, 1960. When the situation of June 30, 1957, is rationalized with the position of management in the taxable years, that the Timer project would be abandoned at any time that it proved unacceptable, it *112 would appear that petitioner's commitment to the project was on a step by step basis. This is emphasized by the changes made in the machine after the field testing, by which petitioner sought to satisfy customer demands that the Timer should do more than merely compute elapsed time. We note too the testimony of Shaw Walker that the Timer did not get out of the experimental stage until the 300 Timers were ordered in September of 1961. Our conclusion is that petitioner's development of the Timer was not far enough advanced during the years in issue to justify any but nominal earmarking of funds. We are convinced that the Timer encountered more difficulties than were expected and that the progress of its development was thereby retarded, however, the continuing experimental phases of its development during the years in issue supports our conclusion on the entire record that petitioner was reasonable in anticipating a need for $150,000 for this purpose in each of such years. Petitioner recognized early in the Timer development the possibilities of manufacturing and selling Timer cards but it made no definite plans with respect to Timer card facilities until about the time the 300 Timers *113 were ordered in September 1961. We have found that Shaw Walker selected a site for a plant in Florence, South Carolina, in December of 1961 and that petitioner proceeded steadily thereafter to construct the plant and install a specially constructed machine therein for the manufacture of Timer cards. The expenditures therefor are reflected in our findings with respect to disbursements for the Timer and the Florence plant in fiscal 1962 and 1963. Any plans for these additions were necessarily dependent on the success of the Timer itself and were, in our opinion, entirely too nebulous and indefinite to justify the retention of any earnings therefor in the taxable years. The fourth ground alleged in petitioner's section 534(c) statement (and still urged) as justification for accumulating its earnings was to provide funds for the repurchase of its Executives Stock. In its statement petitioner claimed that it reasonably anticipated being required to disburse the following amounts for shares of its Executives Stock, namely, $600,000, $665,000, and $760,000 anticipated at the end of fiscal 1955, 1956, and 1957, respectively. Our findings show that petitioner's Executives Stock, so denominated *114 in 1928, was first issued in 1916. The stock was distributed among petitioner's executives and principal officers without any definite plan but to the 10 to 15 recipients selected in early years by L. C. Walker later by L. C. and Shaw Walker, and finally by Shaw-Walker. No member of the Walker family owned any shares of this stock. Management used the stock as an incentive to retain the services of and reward the recipients, and it viewed the distribution of the stock as compensatory in nature because the executive received dividends plus the increase in book value while he or his widow held the stock. The stock certificates set forth certain terms and conditions under which the stock was issued including a formula [3] for the repurchase thereof by the petitioner, and prohibited the sale or transfer of the stock without it being first offered to petitioner at the formula price. After 1944 the issuing price of Executives Stock was $12 per share and in 1952, when the book value of petitioner's stock was *115 about $62 a share petitioner set up an account on its books representing the estimated possible liability (on all then outstanding shares) for Executives Stock, sometimes referred to as executive pension plan. For the taxable years the amount of such liability on all outstanding Executives Stock was shown as $803,190, $1,039,240, and $1,228,725, respectively, at a time when the book value of petitioner's stock was $83.17, $94.48, and $106.78, respectively. No funded reserve was maintained by petitioner for such repurchases and the liability account on its books represented merely a segregation of surplus. Respondent contends that petitioner did not retain any of its earnings for the purpose of redeeming Executives Stock and that it would not have been justified in doing so; that the "cost" to the petitioner does not include the dividends paid on the stock (as petitioner had argued), and that excluding such dividends, the cumulative cost to petitioner in repurchasing Executives Stock had amounted to only $98,575 at June 30, 1957; that the redemption of the stock inured to the benefit of the Walker family; and that petitioner had no legal obligation to repurchase the stock. Petitioner *116 submits that prudent management required it to make some advance preparation to meet the contingencies of its so-called executive pension plan, particularly as it relates to widows of executives. It asserts that by June 30, 1962, more than $2,000,000 had been disbursed under the Executives Stock program, including dividends and amounts paid to repurchase stock, and that petitioner was justified in retaining a portion of its earnings and profits during the taxable years to meet these contingent obligations. We are unable to agree with petitioner that dividends paid on Executives Stock represents any part of the total cost of its so-called Executives Stock program. In our opinion, respondent is correct in his contention that repurchases from 1917 to 1957, inclusive, had cost petitioner a net of $98,575. We would agree that petitioner could reasonably have anticipated that the cost of its repurchases would increase with the increased book values of the stock. Also, the advancing ages of its executives suggested the increasing likelihood of stock repurchases due to deaths, resignations, or retirements. Petitioner now asserts that we should hold that its accumulated earnings in the *117 taxable years were justified to the extent of funds necessary to repurchase such Executives Stock in the hands of widows. The amounts now claimed for this purpose are $565,397, $579,038, and $760,509, respectively. We believe it is doubtful that petitioner was legally bound to repurchase Executives Stock, yet the record does establish that it was a sound business principle for it to do so as to all offered stock. The value of the entire plan as a reward and an incentive to executives would have been seriously damaged if petitioner had ever refused. Even so, after weighing and analyzing the facts we are of the opinion that petitioner would not be justified in accumulating earnings in the amounts claimed. The costs of its Executives Stock program, accumulated to June 30, 1957, were only $98,575 net. In fiscal 1956, 1957, 1958, and 1959, it repurchased (net) $38,403, none, none, and $283,606, respectively. We cannot agree that earnings and profits were reasonably accumulated in such amounts as petitioner urges, however, it is obvious that some part of the accumulations were reasonably considered as being for this purpose, and exercising our best judgment from the entire record we *118 hold that petitioner was reasonable in anticipating needs for $200,000, $225,000, and $295,000 for the respective years in issue. Petitioner's fifth argument is that pending the use of its funds for the previously mentioned four grounds, it could and did use a substantial portion of its retained earnings and profits for increasing its sales to banks, thereby increasing its operating profits. This fifth "ground" is in effect a make-weight argument designed to support and augment the other four grounds. It is not alleged that petitioner accumulated funds to promote bank sales. On the contrary, the allegation is that "None of the Company's earnings and profits have been retained for the sole purpose of employing them in its bank sales program." In addition, Shaw Walker testified that petitioner did not retain any of its earnings specifically for the purpose of promoting its bank selling business or its bank equipment business. Our findings describe petitioner's bank sales and the efforts it made to secure additional bank sales by managing its deposits in banks. They show too that even with favorable balances petitioner's prices for its equipment and products had to be competitive *119 for petitioner to secure the bank's business. Considering all of the above, we conclude that this "ground" is entitled to only nominal weight at best. Our holdings as to petitioner's reasonable needs in connection with its four other alleged grounds show that, as to each year in issue, it had more than $2,000,000 of unneeded accumulated earnings and profits. In view of this wide disparity between its needs and its avails we consider that this fifth "ground" does nothing to aid petitioner's position. As we have indicated, the overwhelming factor in this case is the size of petitioner's accumulated earnings and profits from prior years. Significiant classifications include (rounded): Treasury
Cash
Accumulated
Year Ended
Current
Working
Notes and
and Cash
Earned
Net
June 30
Assets
Capital
Bills
Equivalents
Surplus
Worth
(000)
(000)
(000)
(000)
(000)
(000)
1955
$11,400
$ 9,000
$3,200
$ 6,100
$ 8,900
$10,500
1956
14,000
10,400
4,800
7,500
10,300
11,500
1957
15,400
12,200
6,500
9,400
11,800
13,100
1958
16,600
13,500
5,000
10,000
12,900
14,200
*120 Income Tax Regs., section 1.535-3(b)(ii), provides: In determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years will be taken into consideration. Thus, for example, if such accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business, then any earnings and profits of the current taxable year which are retained will not be considered to be retained for the reasonable needs of the business. * * * Having considered the entire record, and having weighed all of the factors urged by petitioner as its needs and plans, we have concluded that its accumulated earnings and profits of the years prior to each of the years in issue were more than sufficient for the reasonable needs of its business, including the reasonably anticipated needs thereof. In concluding that the record evidence herein is insufficient to prevent the imposition of the accumulated earnings tax we have also weighed the factors that favor petitioner, such as its dividend record, its competition, the stockholders' attendance *121 at meetings in person or by proxy, the complexities of the office equipment industry, the informal manner in which many of petitioner's business transactions were handled, the business policies of L. C. and Shaw Walker and all other facets of this voluminous record. We have concluded that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its business. It follows from this holding that petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders unless proved to the contrary by the preponderance of the evidence. This the evidence fails to prove, and accordingly, Decision will be entered for the respondent. Footnotes
*. On leave of absence for military service in World War II.↩
*. Hereinafter described.↩
*. L. C. Walker received the income from 15,000 shares after the death of his wife, but it does not appear whether he acquired the ownership thereof.↩
*. The principal income items herein are: profits on sales, interest on U.S. obligations, dividends, and discounts. ↩
**. The operating expenses consist primarily of salaries and wages, taxes, advertising expenses, employee benefit payments, and a schedule of "other deductions" attached to the income tax returns. Charitable contributions are excluded from operating expenses.↩
*. Includes Treasury notes and bills. ↩
**. Includes Federal income taxes.↩
*. Called for redemption, July 5, 1955, and at the end of this fiscal year, $17,800 of preferred stock was unredeemed. The amount of unredeemed preferred stock in subsequent fiscal years is also shown.↩
*. Includes Timers purchased and leased to customers, but excludes Timers purchased but not leased.↩
*. These columns relate to fixed assets at Muskegon. Petitioner's total fixed assets as shown by its balance sheets for these years totaled $3,043,600, $3,081,517, $3,273,304, and $3,345,218, respectively.↩
*. Total of the average balances derived by adding the month-end balances of each bank and dividing by 12. ↩
**. Undisclosed after fiscal 1957.↩
a. Fringe benefits included hospitalization, disability, death benefit, and life insurance. ↩
b. Represents employees covered by hospitalization, which was used by more employees than any other of the fringe benefits.↩
1. The difference between accumulated taxable income for the taxable years 1956 and 1957 and the amount of earnings retained in the business, as shown by our findings of fact, is occasioned by long-term capital gain.↩
2. The "these requirements" referred to were additional inactive bank deposits of 1 to 1 1/2 million and the funding of enlarged past service benefits to the extent of $200,000 to $400,000. Thus, capital requirements for normal business operations were apparently being estimated at about 4 million dollars.↩
3. Under such formula petitioner had the option of repurchasing offered stock for the amount paid by the stockholder executive plus any book value increases since its purchase.↩